UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DARRYLL SIMPSON,                                    :

                              Plaintiff,            :        04 Civ. 2565   (PAC)

        - against -                                :        <u>OPINION & ORDER</u>

METRO-NORTH COMMUTER RAILROAD,                      :
MOE KINIRY, SHERRY HERRINGTON, and
and GUS MEYERS, in their official and               :
personal capacities,
                                                   :
                              Defendants.
                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        HONORABLE PAUL A. CROTTY, United States District Judge:

        Plaintiff Darryll Simpson, an African-American male, sues his former employer

Metro North Commuter Railroad and three of its employees, alleging that Defendants discriminated

against him because of his race and then retaliated against him when he complained of race

discrimination, in violation of Title VII and 28 U.S.C. § 1983.[1]  Specifically, Simpson alleges

disparate treatment with regards to pay, hostile work environment, and retaliation in violation of

Title VII, and denial of equal protection in violation of § 1983.

        Defendants now move for summary judgment pursuant to Rule 56(c) of the Federal

Rules of Civil Procedure on two grounds: (1) Simpson fails to make out the <u>prima facie</u> case of

---

[1] Plaintiff also brings claims under N.Y. Executive Law § 296 and the New York City Human
Rights Law, both of which are subject to the same substantive analysis as Plaintiff's federal claims. <u>See</u>
<u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 565 n.1 (2d Cir. 2000).

disparate treatment with regard to pay, hostile work environment, and retaliation and therefore all of

Simpson's discrimination claims must be dismissed as a matter of law; and (2) Defendants are

entitled to qualified immunity on Simpson's § 1983 claims. For the reasons discussed below, the

Court grants Defendants' motion for summary judgment on the first ground, and does not rule on

Defendants' claim of qualified immunity.

## BACKGROUND

Plaintiff Darryll Simpson ("Simpson"), an African-American male, began working

for Defendant Metro North Railroad ("Metro North") in March 1988 as an Assistant Conductor.

(Compl. ¶ 12; Dep. of Pl. Darryll Simpson, Mar. 8, 2005 ("Simpson Dep.") 10:18-20.) He was

promoted to the position of Conductor in March 1989 and Special Duty Trainmaster sometime in

the late 1990s. (Simpson Dep. 22:6-24.) In August 1999, Simpson was promoted to the

management position of Trainmaster at Grand Central Terminal ("Grand Central"). (Compl. ¶ 15;

Simpson Dep. 23:3-9, 25:2-3.)

## STATEMENT OF CLAIMS

Disparate Pay Claim

Simpson's salary as a Trainmaster was approximately $71,000 or $72,000 per year

(Simpson Dep. 55:10-13.), but less than that of other Trainmasters, who started at around $83,000.[2]

(Id. 57:8-19.) Simpson complained to David Schanoes, his supervisor, and to Sherry Herrington,

Metro North's Chief of Operations services, about this disparity in salary and requested a raise to

---

[2] Simpson provides no evidence, apart from his own self-serving deposition testimony, to prove
that other Trainmasters actually received salaries as high as $83,000. When asked during his deposition
how he knew other Trainmasters were making more than he was, he merely stated: "Because one or two
may have told me what they were making," and referred to one colleague, Mr. Schiefelbein, as a potential
example. (Simpson Dep. 53:20-23, 56:15-22, 57:12-16.)

bring his salary "up to par" with the salary of other Trainmasters. (Id. 53:4-7, 57:20-24, 62:10-17) Despite these complaints, Simpson did not get the salary increase he wanted.[3] (Id.)

Metro North's restructured its job titles in 2000,[4] and Simpson's title changed from Trainmaster to Operations Manager/Capital Projects. (Simpson Dep. 70:13-24; Herrington Aff. ¶ 7; Herrington Dep. 76:20-23.) In this capacity, Simpson coordinated capital projects in and around Metro North, which included up to 17 different capital projects at any given time. (Simpson Aff. ¶ 5; Simpson Dep. 86:18-19; Herrington Dep. 17:2-8.) While Simpson thought the new title included an increase in salary, it did not. (Simpson Dep. 5-11.) First, Simpson claims that all of the individuals who performed the Capital Projects job before him were Lead Trainmasters,[5] and therefore received a higher salary for performing comparable work. (Simpson Dep. 72:14-73:19.) Second, Simpson claims that Paul Hirsh and Bill Schilling, the two employees who assumed the Capital Projects positions at Harmon and New Haven (Metro North's other major terminals), received higher salaries.[6] (Simpson Dep. 74:24-75:5.)

---

[3] Simpson admits that he did receive annual cost of living and merit increases, but claims that these increases were not sufficient to bring his salary in line with his non-African-American colleagues. (Simpson Dep. 55:14-25.) The only non-African-American colleagues to which Plaintiff refers are Paul Hirsch and Bill Schilling, both of whom had worked for Metro North longer than Simpson and held different and higher titles. See infra n.6.

[4] In January 2000, Metro North created the Operations Services Department, which combined Metro North's Transportation Department with other departments that handled fleet management, stations, car cleaning, and mechanicals functions of the railroad. (Compl. ¶ 17; Herrington Aff. ¶¶ 2-4; Herrington Dep. 66:9-25.) A number of positions within the merged departments were renamed after the reorganization. (Herrington Aff. ¶ 2.)

[5] The position of Lead Trainmaster is at least one pay grade above the position of Trainmaster.

[6] Simpson alleges that his job is identical to the job performed by Hirsh and Schilling, and therefore Hirsh and Schilling are "similarly situated" employees for purposes of determining salary. (Simpson Dep. 76:17-21.) The evidence suggests that Simpson's job is comparable to the job performed by Hirsh and Schilling. Both the Harmon and the New Haven terminals, where Hirsh and Schilling work,

Simpson complained to his supervisors, Moe Kiniry and Shelly Herrington, about his failure to receive a salary increase, but to no avail. Kiniry approved a salary increase, and convinced his boss, George Walker, to approve the increase, but someone else in the chain of command vetoed the request. (Kiniry Dep. 22:4-23:24.) Simpson also complained to Gregory Bradley, Metro North's Director of Workplace Diversity, about this unequal pay. Bradley never investigated or filed a complaint on Simpson's behalf.

Other Allegations of Discrimination

Simpson alleges other instances of discrimination during his employment with Metro North.[7] Particularly, Simpson alleges that in the early 1990s Metro North denied his request for tuition reimbursement to attend courses in transportation management, even though around the same time a white employee was granted tuition reimbursement for much less relevant course work.

---

have positions titled Assistant Director of Capital Projects (the positions held by Hirsh and Schilling). Grand Central, where Simpson works, does not have such a position. Instead, Simpson's position (Operations Manager/Capital Projects) is the closest thing to the Assistant Director position. Defendants could not explain why Harmon and New Haven have such a position, while Grand Central does not, except to suggest that because Hirsh and Schilling had higher titles than Simpson prior to the reorganization, they took higher titles after the reorganization. (Kiniry Dep. 87:13-22.)

The evidence also reveals, however, that both Hirsh and Schilling are far more senior than Simpson, both in number of years on the job and job title. Hirsh began working for Metro North in the 1960s and Schilling began working for Metro North in 1971. Simpson started more than two decades after Hirsh and 17 years after Schilling. (Herrington Aff. ¶ 6.) Moreover, Hirsh and Schilling were both Lead Trainmasters at the time of the reorganization; Simpson, by contrast, was still only a Trainmaster, which is a lower position at a lower pay grade. (Id.) Upon reorganization, Hirsh and Schilling became Assistant Directors for Capital Projects; Simpson took on the position of Operations Manager/Capital Projects. Simpson does not challenge these facts, but instead dismisses them as irrelevant, arguing that because all three employees performed comparable job tasks, they should be paid comparable salaries.

[7] All of these allegations of discrimination occurred more than three years prior to the filing of the complaint in this action, and are therefore time-barred under Title VII, § 1983, the New York Executive Law, and the New York City Human Rights Law. None of these allegations of discrimination are mentioned in the complaint. Apparently, they are presented only to provide additional support for his claim that Defendants' discriminated against him with respect to pay.

(Simpson Dep. 31:20-48:23.)  Simpson does not provide any concrete evidence documenting his request for tuition reimbursement or Metro North's denial, however; and none of the Defendants had any knowledge of this.  Simpson also claims that he was denied lateral promotions to the training department on two separate occasions, and both times less qualified white applicants were hired for the job. (Id.)  Again, Simpson does not provide any concrete evidence to support this claim.  Simpson complained to Stephen Mitchell, who appears to have been an EEOC employee and to Bradley, in his capacity as Director of Workplace Diversity, about these incidents, but neither Mitchell nor Bradley ever investigated or filed a complaint on Simpson's behalf. (Id.)

Simpson's Problems with Supervisors (Hostile Work Environment)

Simpson had a history of strained relations with senior supervisors.   First, while working as a Conductor, Simpson had problems with Dave Schanoes ("Schanoes"), his direct supervisor.  Their disagreements appear to have been about train operations.  (Simpson Dep. 25:13-15, 26:21-24.)  Simpson's relationship with Schanoes got so bad that the two men got into an argument in front of other employees on the Grand Central platform. (Id. 14:4-25-18:23.)  Simpson criticized Schanoes to Defendant Moe Kiniry on multiple occasions. (Kiniry Dep. 34:7-22.)  Kiniry admits, however, that Simpson was not the only employee that had troubles with Schanoes. (Kiniry Dep. 34:15-18.)  Many employees complained about Schanoes's people skills, to the point that Schanoes was eventually removed from his supervisory position due to his inability to work with others. (Kiniry Dep. 34:23-35:3.)

Notwithstanding the dispute, Simpson was promoted to Operations Manager/Capital Projects in 2000.  Thereafter, Simpson had problems with two different supervisors.  Shortly after he assumed the position, Simpson complained that Fred Sterman gave him so much operations

work that he could not adequately perform his duties for capital projects.[8] (Simpson Dep. 88:16-93:2.)  Simpson complained to Sherry Herrington about it, and she went to speak with Sterman. (Id.)  Simpson admits that his complaints about Fred Sterman did not involve race discrimination.

In April 2002, Gus Meyers transferred into Grand Central and became Simpson's direct supervisor. (Meyers Dep. 5-6.)  Simpson and Meyers clashed from the start.  According to Simpson, Meyers micromanaged his work, spoke to him in a demeaning tone, and yelled at him over insignificant things like answering the telephone during a conversation. (Simpson Dep. 123:15-126:13, 128:4-25, 134:15-20.)

Again, Simpson complained to Kiniry.  (Simpson Dep. 19-23.)  As Meyers was the third supervisor that Simpson griped about to Kiniry, Kiniry began to get annoyed. (Kiniry Dep. 33:11-34:6, 40:5-10, 41:11-23.)  Kiniry explained:

> At first I took [Simpson's complaints] as off the record friendly, but then [Meyers] was kind of like strike three, in my mind.  Why is it . . . this is the third person [Simpson's] working for that he finds or feels compelled to bring some issue, what he feels may be shortcomings to my attention.
>
> . . . I would call it complaining.

(Kiniry Dep. 41:11-23.)  "I questioned in my mind at that point whether the real issue was that Darryll had a problem with authority." (Kiniry Dep. 40:8-10.)  Simpson's complaints to Kiniry focused on Meyers's behavior; Simpson never complained that Meyers used racial epithets or raised concerns that Meyers's treatment of Simpson was racially motivated. (Kiniry Dep. 46:16-47:6.)

---

[8] Sherry Herrington explains that "the basic operations of the railroad take priority over capital projects," and therefore "the Operations Manager/Capital Projects is expected to be on-call to assist with Field Operations when needed." (Herrington Aff. ¶ 9.)  Field Operations means running the railroad. Simpson, Herrington's subordinate, disagreed.  He preferred not to have Field Operations jobs. (Simpson Dep. 88:16-93:2.)

Simpson also asked Herrington to intervene. As with Fred Sterman, Simpson believed that Meyers was unfairly demanding that he handle Field Operations tasks, even though his primary obligation was capital projects, and therefore Simpson thought that Herrington could speak to Meyers, as she had done previously with Fred Sterman. (Simpson Dep. 132:9-23.) This time Herrington refused to get involved and told Simpson that he should do whatever Meyers told him to do. (Id.) Herrington explains:

> At no time did Simpson ever tell me that he believed that Meyers
> or any of his other supervisors harrassed him or discriminated
> against him due to his race . . . . Thus, as far as I was concerned,
> the trouble between Simpson and Meyers was a basic conflict over
> the scope of Simpson's responsibilities and his willingness to
> follow Meyers' directives.

(Herrington Aff. ¶ 12.)

Upset at Herrington's response, Simpson went to Gregory Bradley. Accordingly to Simpson, Bradley did not take his complaint seriously, nor did he ask Simpson to write it up. (Simpson Dep. 142: 18-20, 146:7-9.) Instead, Bradley told Simpson that he was being "cantankerous" and told Simpson that he would speak with Herrington and sort it out. (Simpson 142:22-23, 146:7-16.) Again, Simpson's complaints never referred to race, but instead focused on the unfairness of both Meyers's and Herrington's actions. (Bradley Dep. 32:10-23, 34:4-25.)

Simpson's Transfer to Harmon and Resulting Retaliation Claim

Sometime in July 2002, not long after Simpson's conversation with Bradley, Sherry Herrington told Simpson that she was reassigning him to the position of Operations Manager/Field Operations at Harmon station. (Herrington Dep. 103:18-105:25; Simpson Dep. 141:16-142:3.)

While Simpson refers to this lateral transfer as a "demotion," there was no reduction in pay, benefits, or seniority.[9] (Simpson Dep. 169:6-10, 175:18-22.)

When Simpson inquired about why he was being transferred, Herrington explained that Simpson needed to work on his team-building skills and thought that the position at Harmon was more team-oriented. (Simpson Dep. 142:2-10; 144:2-6.) Herrington also told Simpson that he needed to learn not "to talk to Greg Bradley all the time."[10] (Simpson Dep. 142:8-10.) Herrington explained during her deposition:

> I felt that [Simpson] had problems with his communication and team building skills and I felt putting him in a less autonomous position, where he would have to work with other team members and communicate effectively with them, to be successful in his position would help improve his skills in that area.

(Herrington Dep. 105:12-21.) Herrington viewed the transfer as a lateral shift, not a demotion.

---

[9] Simpson claims that the new position was a demotion because it was less prestigious and the work was less interesting. Simpson also claims that the transfer was burdensome, and the longer commute from his home in the Bronx would make caring for his ailing mother more difficult. The latter reasons are surely personal and cannot be the basis for any legal redress.

[10] Simpson contends that this comment is direct evidence of race discrimination. Herrington argues, however, that Simpson is now taking the comment out of context. Herrington explained during her deposition:

> I had a conversation with [Simpson] explaining to [him] that he should feel comfortable to come to me if he has a problem, that I have an open door policy and I'm more than willing to resolve issues he has, that he does not have to go to [Bradley] because the process is that [Bradley] will got to [Kiniry] and [Kiniry] will come to me and I will be sitting across from [Simpson] discussing the issue any way so he should feel free to come on up and talk to me. (Herrington Dep. 98:14-24.)

This was a request for direct communication. It certainly was not a direction that Simpson not use the existing EEO procedures. Simpson never filed an EEO complaint, or sought to make use of any of the EEO procedures available at Metro North.

Simpson's transfer was not out of the ordinary. As part of the Metro North reorganization started in 2000, Herrington and Kiniry made many reassignments in the Operations Services Department. Herrington explained:

> [A]fter the reorganization there was constant movement of positions where I was trying to put teams together that could work effectively together in terms of skills, personality types, management skills.
>
> So many, many managers were moved. [Simpson] was involved in the move with two other individuals that I had other reasons for moving . . . and Harmon became the position and I thought [Simpson] would be a good fit in Harmon.

(Herrington Dep. 104:20-105:7; Herrington Aff. ¶ 13.) Overall, at least twelve different managers and superintendents–of all races–were transferred to different district locations between 2001 and 2002. (Herrington Aff. ¶ 14.)

Simpson challenged Herrington about the transfer. When this did not work, he escalated his objections to Kiniry and Walker. (Simpson Dep. 144:15-19; Herrington Aff. ¶ 22.) In one memorandum to Kiniry, Simpson wrote: "Ms. Herrington's actions are bias, unwarranted, and retaliatory. . . . [T]he fact remains that I have been singled out and treated different than my counterparts." (Simpson Aff., Ex. B.) Despite his objections, Simpson was told that he had to transfer to Harmon.[11]

Simpson was originally scheduled to start at Harmon on approximately September 3, 2002. (Simpson Dep. 175:2-14; Herrington Aff. ¶ 23.) He postponed his start date twice, and

---

[11] When Simpson was transferred to Harmon, his position as Operations Manager/Capital Projects at Grand Central was filled by Trevor Forde, an African-American employee. (Herrington Dep. 123:2-14.)

finally reported to Harmon on September 10, 2002. (Simpson Dep. 175:23-25, 186:3-5; Herrington Aff. ¶ 23.) Paul Hirsh, Assistant Director for Capital Projects at Harmon, gave Simpson a tour of the station and gave Simpson his telephone number in case is needed assistance during his first shift. (Simpson Dep. 176:3-18.) Simpson never attempted to call, but later complained that he was unable to properly perform at Harmon due to lack of adequate training. (Simpson Aff., Ex. C.)

After his first shift, Simpson wrote to Walker, complaining that Herrington "has not assigned anyone to guide [him] through Harmon's work process," in contrast to other reassigned employees, to whom other employees were assigned to ensure proper training. (Simpson Aff., Ex. C.) Simpson suggested that this disparate training was just another instances in a long history of disparate treatment. Again he did not refer to race. He wrote: "How else I'm supposed to understand or look at this situation other than as a bias and harassing action by Ms. Herrington. . . . [T]his is another example of the continuing bias and harassing actions towards me." (Id.)

September 10, 2002 was Simpson's one and only work day at Harmon. For the next three days, he called in sick (Simpson Dep. 186:21-187:12; Simpson Aff., Ex. D.); but never identified a physical illness or provided a doctor's note. Instead, he said that he had "personal reasons" for failing to come to work. (Herrington Dep. 112:18-23; Simpson Dep. 195:12-13; Simpson Aff., Exs. D & E.) During this period, Herrington met with Walker, Bradley, and Shirley Joshua, Metro North's Director of Human Resources, to discuss Simpson's complaints about transferring to Harmon. On September 16, 2002, Bradley and Joshua met with Simpson and instructed him to tell them whether there was anything preventing him from going to work at Harmon. Simpson denied that any particular reason for not returning to Harmon, though he

complained that they did not train him there. Simpson did not mention harassment or discrimination at any time during the meeting.

After this meeting, Bradley took Simpson to another meeting with Walker and Herrington. Walker gave Simpson two options: either accept the position at Harmon or give up his management position and "exercise his rights" with the union. Simpson refused to work at Harmon, so Walker removed Simpson from his position and advised him to exercise his union rights. (Simpson Aff., Ex. E.) Simpson opted not to contact the union, thereby terminating his employment with Metro North. (Id.)

## DISCUSSION

### I. STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . ." Fed. R. Civ. P. 56(c). An issue of fact is "material" when it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" when the evidence permits a reasonable jury to find in favor of the nonmoving party. Id.

The burden of demonstrating that no genuine issue of material fact exists falls on the party seeking summary judgment. Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). If the moving party establishes the absence of a genuine issue of material fact, "a limited burden of production shifts to the nonmovant, who must . . . come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. (quoting Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.

1993)).  If the nonmoving party fails to establish a genuine issue of material fact, summary judgment should be granted. <u>Id.</u>

In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255; <u>Make the Road by Walking, Inc. v. Turner</u>, 378 F.3d 133, 142 (2d Cir. 2004).  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." <u>Jeffreys v. City of New York</u>, No. 03-257, 426 F.3d 549, 553 (2d Cir. 2005).  Consequently, summary judgment on an issue of fact is not appropriate "if there is *any* evidence in the record that could reasonably support a jury's verdict for the nonmoving party." <u>Lucente v. Int'l Bus. Machs. Corp.</u>, 310 F.3d 243, 254 (2d Cir. 2002) (emphasis added).

Despite the Court's obligation to review all evidence in favor of the nonmoving party, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." <u>Jeffreys</u>, 426 F.3d at 554 (quoting <u>Anderson</u>, 477 U.S. at 252).  Mere "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." <u>Niagara Mohawk Power Corp. v. Jones Chemical, Inc.</u>, 315 F.3d 171, 175 (2d Cir. 2003).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), he "must offer some *hard evidence* showing that [his] version of the events is not wholly fanciful." <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir. 1998) (emphasis added).  The Court  must grant summary judgment for defendant where plaintiff's evidence is "merely colorable, conclusory, speculative, or not significantly probative." <u>Anderson</u>, 477 U.S. at 249-50.  Plaintiff cannot create a disputed issue

of fact by offering "conclusory allegations, conjecture, and speculation." Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003). Instead, to survive summary judgment, Plaintiff's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." Contemporary Mission v. U.S. Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981) (internal citations and quotation marks omitted).

## II. PLAINTIFF'S CLAIMS OF DISCRIMINATION ON THE BASIS OF HIS RACE

The Court analyzes Simpson's discrimination claims under the three-part burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995). First, plaintiff must establish a prima facie case that he suffered from a discriminatory employment action on the basis of his race, "by either direct, statistical or circumstantial evidence." Bickerstaff v. Vassar Coll., 196 F.3d 435 (2d Cir. 1999); McDonnell-Douglas, 411 U.S. at 802. This burden is minimal. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). The burden then shifts to defendant to provide a legitimate, nondiscriminatory reason for its actions. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); McDonnell Douglas, 411 U.S. at 802; Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005).[12] If an employer articulates a nondiscriminatory reason for its conduct, the inference of discrimination raised by plaintiff's prima facie case "simply drops out of the picture," and the

---

[12]     The defendant's burden of production also is not a demanding one; defendant need only offer such an explanation for the employment decision. Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with plaintiff. Bickerstaff v. Vassar Coll., 196 F.3d 435, 447 (2d Cir. 1999).

burden shifts back to plaintiff to prove that the employer's nondiscriminatory explanation is pretextual. St. Mary's Honor Ctr., 509 U.S. at 507-08, 511.

The McDonnell Douglas framework applies to both employment discrimination claims brought under Title VII and equal protection claims arising out of the same conduct brought under 42 U.S.C. § 1983. See Demoret v. Zegarelli, No. 05-1831, slip op. at 13 (2d Cir. June 8, 2006); Feingold v. New York, 366 F.3d 138, 159 & n.20 (2d Cir. 2004). "The elements of one are generally the same as the elements of the other and the two must stand or fall together." Feingold, 366 F.3d at 159. Therefore, the Court will review both Plaintiff's discrimination claims under Title VII and his equal protection claims under § 1983 simultaneously.

A. Plaintiff's Claim of Disparate Treatment with Respect to Pay

To establish a prima facie case of discrimination based on disparate pay, a plaintiff must show: (1) that he was a member of protected class; (2) that he was paid less than similarly situated employees who are not members of the plaintiff's protected class; and (3) evidence of discriminatory animus. See Belfi v. Prendergast, 191 F.3d 129, 139-40 (2d Cir. 1999); Quarless v. Bronx-Lebanon Hosp. Ctr., 228 F. Supp. 2d 377 (S.D.N.Y. 2002).

Defendants concede that, as an African American, Simpson is a member of a protected class. They also concede that Simpson was paid less than Hirsh and Schilling, white employees who performed comparable duties at other stations. Plaintiff erroneously argues that his racial status and the pay discrepancy is sufficient to establish a prima facie case of disparate pay.

To make out a claims for disparate pay, a plaintiff must establish that the individuals with whom he attempts to compare himself are "similarly situated" in all material respects. See DeJesus v. Starr Technical Risks Agency, Inc., No. 03 Civ. 1298, 2004 WL 2181403, at *9

(S.D.N.Y. Sept. 27, 2004). "Employees are not 'similarly situated' merely because their [job responsibilities] might be analogized." Quarless v. Bronx-Lebanon Hosp. Ctr., 228 F. Supp. 2d 377, 383 (S.D.N.Y. 2002). Instead, to be "similarly situated," employees must be substantially similar as to specific work duties, education, seniority, and performance history, all of which affect an employee's rate of pay. See DeJesus, 2004 WL 2181403, at *9; Quarless, 228 F. Supp. 2d at 383-84. Plaintiff does not have to be identical to the employees with whom he compares himself, but "a valid comparison between employees can only be made if they shared 'sufficient employment characteristics . . . so that they could be considered similarly situated.'" Quarless, 228 F. Supp. 2d at 383 (quoting McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001)).

Here, Simpson's similarity with Hirsch and Schilling is that all three had comparable job responsibilities, but that is not sufficient. To be "similarly situated," however, Hirsch and Schilling would also have to be similar to Plaintiff with regard to such factors as seniority and performance history. Both Hirsch and Schilling have far greater seniority and higher titles than Simpson. Hirsh joined Metro North in the 1960s and was promoted to Lead Trainmaster in 1989. Shilling joined Metro North in 1971 and was promoted to Lead Trainmaster in 1989. By way of contrast, Simpson began his career with Metro North in 1988, and was not promoted to Trainmaster (at least one level below Lead Trainmaster) until ten years later in 1999. As part of the 2000 Reorganization, Lead Trainmasters were retitled Assistant Directors, while Trainmasters were retitled Operations Managers. Simpson was never "similarly situated" to Hirsh or Schilling; he was employed at Metro North for a far shorter period than both Hirsh (at least two decades) and Schilling (seventeen years) and never reached the same job title as they held. Thus, Plaintiff's disparate pay claim fails as a matter of law.

Further, there is no proof of animus. In order to prevail on a claim of disparate pay in violation of Title VII, Plaintiff bears the burden of proving that defendant acted with an intent to discriminate against plaintiff on the basis of his protected status. Belfi v. Prendergast, 191 F.3d at 140. Thus, Plaintiff must provide some evidence from which a reasonable jury could find that the reason for this discrepancy in pay was plaintiff's race. Simpson provides no such evidence.

In fact, Defendants offer a legitimate, nondiscriminatory explanation for the discrepancy in pay. Each position at Metro North is assigned a grade level that determines the applicable salary range. (Herrington Aff. ¶ 5.) Employee salaries increase with seniority, cost of living increases, and promotions to positions at higher grade levels with corresponding higher salaries. (Id.) Under such a seniority/title driven system, one would expect that both Hirsch and Schilling, who served far longer and with higher titles than Simpson, would have higher salaries.

Given this legitimate, nondiscriminatory explanation for the disparity in pay between Plaintiff and his non-African-American colleagues, Plaintiff had the burden to establish that Herrington's explanation was pretextual. Plaintiff fails to provide any evidence from which a reasonable jury could find that Herrington's explanation is false, or that the disparity in pay between Plaintiff and his non-African-American colleagues was, even in part, motivated by race discrimination. Accordingly, the Court dismisses Plaintiff's claim for disparate treatment with respect to unequal pay as a matter of law.

B. Hostile Work Environment

To establish a prima facie case of hostile work environment, plaintiff must demonstrate that: (1) his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) a specific

basis exists for imputing the conduct that created the hostile work environment to the employer. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) (internal quotation marks omitted)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). The conduct alleged must be sufficiently severe and pervasive "to create an environment that 'would be perceived, and is perceived, as hostile or abusive.'" Schwapp, 118 F.3d at 110 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Alfano, 294 F.3d at 374 (internal citations omitted). The inquiry is fact specific and must be determined on a case-by-case basis. Schwapp, 118 F.3d at 110.

Simpson does not allege that any of his supervisors used racial slurs or epithets or even referred to his race at any point during his employment; nor does Simpson allege that his supervisors subjected him to "discriminatory intimidation, ridicule, and insult." Instead, Simpson merely alleges that his supervisors yelled at him unnecessarily, spoke to him in a disrespectful tone, and "micromanaged" his work. Even if the alleged incidents could be connected to Simpson's race (a conclusion wholly unsupported by the current record), these incidents were neither severe enough nor pervasive enough to alter the conditions of Simpson's employment, and therefore they are insufficient to support a claim for hostile work environment under existing case law.

This record is barren of any evidence from which a reasonable jury could find that the allegedly hostile incidents were connected to Simpson's race. In each case, a supervisor

"yelled" or "talked down" to Simpson about the way he performed his work. Simpson does not

allege that any of his supervisors made racially-suggestive comments, nor does he provide any

evidence that the allegedly offending supervisors spoke to non-African-American employees

differently. Instead, Plaintiff appears to suggest that the mere fact of the racial difference between

him and his supervisors is sufficient to create a genuine issue of fact as to whether Plaintiff was

criticized because of his race. This is an impermissible inference. Simply because (1) supervisors

criticized Plaintiff's work, and (2) Plaintiff is African American, does not add up to the conclusion

that (3) supervisors criticized Plaintiff because he is African American. "This is exactly the type of

groundless speculation that summary judgment is designed to root out." Richardson v. Newburgh

Enlarged City Sch. Dist., 984 F. Supp. 735, 744 (S.D.N.Y. 1997). Plaintiff must provide some

evidence from which a reasonable jury could find that Defendants targeted Plaintiffs on account of

his race. Such evidence is lacking in this case.

   C. Retaliation

           Along with the disparate pay and hostile work environment claims, Plaintiff's

complaint alleges that Defendants retaliated against him for lodging complaints of race

discrimination. To make out a prima facie case of retaliation, plaintiff must establish three

elements: (1) that he participated in a protected activity known to defendants; (2) defendants

subjected plaintiff to an adverse employment action; and (3) there is a causal connection between

the protected activity and the adverse employment action. Cruz, 202 F.3d at 566; Tomka, 66 F.3d at

1308.

           Plaintiff alleges retaliation in two forms: (1) his transfer to Harmon Terminal in

retaliation for complaints about race discrimination; and (2) his termination in September 2002 in

retaliation for complaining that his transfer to Harmon Terminal was racially discriminatory. The Court will address these two claims separately because the proof supporting each of these claims is slightly different.

### 1. Retaliatory transfer

#### (a) Plaintiff's prima facie case

The first element that Plaintiff must prove in order to establish a claim for retaliatory transfer is that Plaintiff participated in a protected activity that was known to Defendants. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Cruz, 202 F.3d at 566 (citing 42 U.S.C. § 2000e-3). As the Second Circuit explained in Cruz, "opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection," and may include "'making complaints to management'" or reporting a Title VII violation to human resources personnel. Id. (quoting Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)).

Plaintiff alleges that he participated in the protected activity of complaining to supervisors about race discrimination in this workplace. Evidence submitted by both parties reveals that Plaintiff spoke with Gregory Bradley on a number of occasions about unfair treatment in the workplace, including complaining about unequal pay and about being treated poorly by Sterman and Meyers. Bradley is the Director of Workplace Diversity, which included monitoring compliance of equal employment opportunity ("EEO") laws. Bradley often spoke to Herrington or Kiniry about the things that Simpson said, so they had knowledge of Simpson's complaints. Simpson also complained to Herrington, Kiniry, and Walker about unequal pay and about inappropriate behavior by his supervisors, Schanoes, Sterman and Meyers.

There are two problems with Plaintiff's proof. First, while Simpson complained on a number of occasions to Bradley, the Director of Workplace Diversity, about unfair treatment, none of Plaintiff's complaints actually referred to race. Regardless, Plaintiff alleges that a reasonable jury could find that Plaintiff's complaints to Bradley were complaints about race discrimination simply because Bradley worked in the capacity of Director of Workplace Diversity, which included acted as an EEO compliance officer.

This inference is complicated, however, by the fact that Plaintiff and Bradley were more than work associates, they were friends. As Bradley explained during his deposition: "Darryll Simpson was an employee that I knew, I met at work, and he would often ask me his opinion – my opinion on various issues. And when Darryll spoke to me . . . he was asking me as a friend." (Bradley Dep. 6:19-24.) Bradley further elaborated that while the two did not socialize regularly outside of work, Plaintiff came to speak with Bradley "about four times a week." (Id. 8:23-9:11.) Plaintiff would often discuss his personal problems with Bradley, such as how he got "a fellow Metro-North employee pregnant" and about "his mother being sick," and the two employees "talked about music a lot," since they were both music collectors. (Id. 7:24-8:18.) Thus, when Plaintiff complained to Bradley about unfair treatment in the workplace, there is no reason to believe that Plaintiff complained to Bradley in his capacity as an EEO compliance officer. Certainly, Simpson never filed an official complaint, and Bradley never thought Simpson was complaining about racial discrimination.

In fact, Bradley believed that Simpson's complaints were raised "as a friend," not "as an employee" (id. 6:16-24). This understanding was furthered by the fact that Plaintiff's complaints to Bradley were done in an informal manner: Plaintiff did not submit his complaint in writing or

follow the proper procedure for filing an EEO complaint, though he had utilized the procudure in the past and knew how to do so. (Bradley Dep. 21:18-23:19.) In many instances Plaintiff did not even approach Bradley in his office, instead voicing his dissatisfaction with supervisors during friendly discussions in the terminal. (Id.) Bradley stated:

> If someone walks into the office and they have a complaint . . . They will be asked to put their complaint in writing. [Someone then investigates.] [Simpson] never did that at all . . . .
>
> [Simpson] has utilized workforce diversity before. So he knows, if he wanted to complain about something officially, he could do that. I believe that Darryll now is using the fact that we were friends to allege that he complained to me, and he knows that he did not complain.

(Bradley Dep. 22:4-17 and 23:13-19.) Thus, no reasonable jury could find, on the record provided, that Simpson complained about a protected activity, i.e., race discrimination, just because he talked with Bradley.

Nor did Plaintiff's memos to Herrington, Kiniry, and Walker ever expressly refer to race. Simpson claimed that Meyers micromanaged his work, spoke to him in a demeaning tone, and yelled at him over insignificant things. Simpson's complaint was that Meyers was being unfair, not that he was racially discriminatory. Further, Plaintiff's complaints about Meyers were similar in form and content to his earlier comments about Sterman, which Plaintiff admits were not race-related complaints. Thus, it was reasonable for Defendants to believe that Plaintiff's nearly identical complaints about Meyers were also unrelated to race. Plaintiff's conclusory allegations, after the fact, that Plaintiffs must have known that his complaint were race-based, even though these complaints never mentioned race and were substantially similar to the non-race-related complaints

about a prior supervisor, are unconvincing. Thus, even when examining all the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff's evidence insufficient to establish a genuine issue of fact.

Plaintiff also fails to establish that his transfer amounted to an adverse employment action. While Plaintiff characterizes his transfer to Harmon as a demotion, he provides no evidence to support this characterization. Plaintiff's move from Grand Central Terminal to Harmon Terminal was nothing more than a lateral shift in position, which does not amount to an adverse employment action under the current law.

"An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (quoting Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). Examples of an adverse employment action include "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Id. (quoting Galabya, 202 F.3d at 640). Plaintiff admits that his transfer from Grand Central Terminal to Harmon Terminal did not entail a reduction in pay, benefits or seniority; and Simpson retained his title as "Operations Manager."

Regardless, Plaintiff contends that the transfer was a demotion, and therefore an adverse employment action, because the work at Harmon Terminal was less prestigious and less interesting than the work at Grand Central. But Plaintiff bare assertions that the work at Harmon Terminal was "less interesting," without any evidence that the transfer resulted in "significantly diminished material responsibilities," cannot turn an otherwise legitimate transfer into an adverse

employment action.  Thus, the Court finds that Plaintiff fails to make out a <u>prima</u> <u>facie</u> case of retaliation based on his transfer to Harmon Terminal.

*(b) Defendants' legitimate, nondiscriminatory explanation*

Defendants proffer a legitimate, nondiscriminatory reason for transferring Plaintiff, namely, Plaintiff's inability to get along with his supervisors, which Plaintiff fails to rebut. Therefore, Plaintiff's claim of retaliatory transfer would fail even if Plaintiff made out a <u>prima</u> <u>facie</u> case.

Defendants decided to transfer Plaintiff after he complained about Gus Meyers, the third supervisor in two years with whom Plaintiff was having trouble.  As Defendants explained, Plaintiff's problem with Meyers "was kind of like strike three," making Defendants realize that Plaintiff "had problems with his communication and team-building skills." (Kiniry Dep. 41:11-23; Herrington Dep. :12-21.)  Defendants decided to place Plaintifff in a comparable position, "where he would have to work with other teams members and communicate effectively with them," hoping that such a transfer "would help improve [Plaintiff's] skills in that area." (Herrington Dep. 105:12-21.)  Herrington believed the Operations Manager position at Croton Harmon was a good fit, and therefore decided to send Plaintiff there.

Defendants also explained that after the reorganization in 2000, "many managers were moved." (Herrington Dep. 104:20-105:7.)  In fact, two other individuals were moved around the same time Plaintiff was transferred. (<u>Id.</u>)  Thus, there was nothing suspicious or unique about Plaintiff's transfer; transferring Plaintiff to Harmon seemed like a good way to both solve Plaintiff's teambuilding and communication problems and meet the staffing needs arising out of the reorganization.

Metro North is charged with the responsibility of running a large, complex commuter rail system; and providing prompt, efficient and effective service to the riding public. All of its employees must cooperate in this venture. Title VII does not strip an employer of its right to transfer an employee to further a legitimate business purpose. Here, Defendants had a number of legitimate reasons for transferring Plaintiff: not only to run the railroad but also to remedy the strained working relationship between Plaintiff and his supervisor; to move Plaintiff to a position that Defendants believed was better suited to provide the teambuilding and communication skills that Plaintiff needed in order to become a more effective manager; and, to meet the staffing needs of Metro North's recent reorganization.

It is not the Court's role to question the propriety of these reasons, even if Plaintiff is a member of a protected class. The courts have explained:

> Federal courts "do not sit as a super-personnel department that reexamines an entity's business decision. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firms managers, [Title VII] will not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior."

Das v. Our Lady of Mercy Med. Ctr., No. 00 Civ. 2574, 2002 WL 826877, at *12 (S.D.N.Y. Apr. 30, 2002) (quoting Elrod Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)). Defendants' explanation is both legitimate and nondiscriminatory, and therefore Defendant has met its burden.

### (c) Pretext

Plaintiff fails to provide proof sufficient to rebut Defendants' explaination. Once a defendant profers a legitimate, nondiscriminatory explanation for its actions, plaintiff must "point to

evidence that reasonably supports a finding of prohibited discrimination" in order to withstand summary judgment. Das v. Our Lady of Mercy Med. Ctr., No. 00 Civ. 2574, 2002 WL 826877 (S.D.N.Y. Apr. 30, 2002) (quoting Ogbo v. New York State Dep't of Fin., No. 99 Civ 9387, 2001 Dist. LEXIS 12920, at *14 (S.D.N.Y. Aug. 24, 2001) (internal quotation marks omitted). "[T]he factual inquiry [at this stage] proceeds to a new level of specificity," St. Mary's Honors Ctr., 509 U.S. at 51, and Plaintiff's "initially vague allegations of discrimination" must be "increasingly sharpened and focused." Meiri, 759 F.2d at 995.

Plaintiff points to only one piece of evidence to support his argument that Defendants' explanations–Plaintiff's weak teambuilding and communication skills and the staffing needs of the Department–are pretextual: Plaintiff's satisfactory performance evaluation in April 2000, more than two full years prior to his transfer. But this evidence does nothing to rebut Defendants' explanation. Subsequent to the evaluation, Simpson's difficulties with his interacting with his superiors began to manifest themselves. Further, the reorganization of the Operations Division at Metro North commencing in 2000, (and on-going thereafter), changed the staffing needs of the organization, requiring employees to be transferred between terminals. Thus, the earlier evaluation to which Plaintiff refers does nothing to rebut Defendants' explanation for the transfer. On the facts of this case, the Court cannot find any evidence from which a reasonable jury coulf find that Defendants' presumptively valid reasons for transferring Plaintiff were pretextual, masking discrimination on the basis of race.

*2. Retaliatory termination*

*(a) plaintiff's prima facie case*

As to a <u>prima facie</u> case for retaliatory termination, Plaintiff aggressively protested his transfer to Harmon, and complained on multiple occasions about the transfer to the individual Defendants.  There is no doubt that Defendants knew of Plaintiffs' activities.  But similar to Plaintiff's complaints about supervisors prior to his transfer, Plaintiff's complaints about the transfer never referred to race, so the question here is whether Plaintiff's complaints can reasonably be viewed as complaints about race discrimination, and therefore a "protected activity" for purposes of Plaintiff's retaliation claim.

In two separate e-mails to the individual Defendants, Plaintiff referred to the transfer as "bias," "harassing," and "retaliatory," and alleged that he was being "singled out and treated different from [his] counterparts."(Simpson Dep., Ex. B & C.)  While Plaintiff never referred to his status as an African American or alleged that the "bias" he referred to was race discrimination, there is some evidence—however minimal—from which a reasonable jury could infer that Plaintiff complained about race discrimination, and therefore that Plaintiff engaged in a "protected activity" for purposes of establish a <u>prima facie</u> case.  Plaintiff also establishes that Defendants subjected him to an adverse employment action, as it is undisputed that termination of employment is an adverse employment action for purposes of a Title VII retaliation claim. See <u>Terry v. Ashcroft</u>, 336 F.3d at 138.

Finally, there is sufficient evidence from which a reasonable jury could find a causal connection between the Plaintiff's complaints and his termination.  Initially, a plaintiff's burden to demonstrate a causal connection between the protected activity and the adverse employment action

is de minimis.  For purposes of establishing a <u>prima facie</u> case, a plaintiff ordinarily need demonstrate only that "the protected activity preceded the adverse action in order to satisfy the causation requirement," <u>Raniola v. Bratton</u>, 243 F.3d 610, 624 (2d Cir. 2001), and short intervals of time between the protected activity and the adverse employment action may be used as "indirect evidence from which causation could be found." <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 217 (2d Cir. 2001).

Plaintiff complained about the transfer repeatedly throughout July, August and September 2002.  He sent a memorandun to Kiniry complaining of the transfer on August 22, 2002, and a similar memorandum to George Walker on September 10, 2002.  Plaintiff was terminated on September 17, 2002.  Thus, there is a clear temporal proximity between Plaintiff's complaints and his termination.  This is sufficient to make out a <u>prima facie</u> case.

### (b) Defendants legitimate nondiscriminatory explanation

Plaintiff's claim of retaliatory termination fails despite his <u>prima facie</u> case, as Defendants provide a legitimate nondiscriminatory reason for firing Plaintiff on September 17, 2002.  After spending one day at Harmon Terminal on September 10, 2002, Plaintiff called in sick for three days in a row.  When Herrington asked Plaintiff about his sickness, Plaintiff told her "he wasn't going to Harmon because two reasons . . . he wasn't trained properly and second because personal reasons." (Herrington Dep. 112:18-23.)  He did not cite any physical illness that would prevent him from returning to Harmon and never provided a doctor's note confirming that he was ill. (<u>Id.</u> 112:18-113:23, 115:23-116:5.)  When asked if his "personal reasons" would prevent him from coming to work, Plaintiff said "no." (<u>Id.</u> 116:5-7, 15-18.)  Finally, Defendants gave Plaintiff the option to accept the position at Harmon and return to work, or exercise his rights with the union

to find a non-management position. (Id. 145:14-24.)  Plaintiff chose not to return to Harmon, so his

position was terminated. (Id. 146:10-21; Simpson Aff., Ex. E.)  Clearly, Defendants did not want to

fire Simpson.  Indeed, they asked him to return to work.  He refused.  Moreover, Simpson could

have stayed on the job, and filed a complaint about his transfer, as both discriminatory and

retaliatory.  He rejected that plain and obvious option and refused to return to work.  He even

rejected his option of returning to his underlying union position.  On this record, Simpson appears

to be the architect of his own termination.

*(c) Pretext*

Again, Plaintiff claims that Defendants' explanation is pretextual, and that Plaintiff's

termination was really motivated by a desire to punish Plaintiff for complaining about race

discrimination.  To support this position, Plaintiff points to four facts: (1) Plaintiff specifically

stated that he would return to Harmon when he recovered from his unidentified illness; (2) Plaintiff

had already commenced work at Harmon at the time he was fired; (3) Plaintiff had relocated to live

within Harmon's district; and (4) Plaintiff stated in writing the Defendants that he would continue

to work hard for Metro North. (Pl.'s Mem. Law Opp'n Mot'n Summ. J. 21.)  Despite Plaintiff's

urgings to the contrary, however, these "facts" do not save Plaintiff's case from summary judgment.

Plaintiff must prove not only that Defendants' "presumptively valid reasons" for its

conduct were pretextual, but must also prove that "a motivating reason was discrimination."

McDonnell Douglas, 411 U.S. at 805; Bickerstaff v. Vassar Coll., 196 F.3d 435, 447 (2d Cir. 1999)

(internal quotation marks and citations omitted).  "The evidence as a whole must be sufficient to

sustain an 'ultimate finding' of intentional discrimination." Peterson, 32 F. Supp. 2d at 684 (citing

Fisher, 114 F.3d 1338).  Even if the Court believed that Plaintiff's evidence was sufficient to raise

doubt about the truth of Defendant's explanation (and it does not), none of Plaintiff's evidence points to racial animus as the real reason for Defendants' conduct. Thus, no reasonable jury could find from Plaintiff's evidence that Defendant's explanation for its conduct was "in fact a coverup for a racially discriminatory decision." St. Mary's Honor Ctr., 509 U.S. at 518 (quoting McDonnell Douglas, 411 U.S. at 805). Accordingly, Plaintiff's claim of retaliatory transfer fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is GRANTED. There are no genuine disputed issues of fact as to disparate treatment, hostile work environment or retaliation on the basis of race. Accordingly, Plaintiff's claims of discrimination in violation of TitleVII and § 1983 are hereby DISMISSED with prejudice. The Clerk of the Court is directed to enter judgment and close out this case.

Dated: New York, New York
July 20, 2006

SO ORDERED

PAUL A. CROTTY
United States District Judge